**LEHIGH VALLEY R. CO. v. ALLIED MACHINERY CO. OF AMERICA.***

(Circuit Court of Appeals, Second Circuit. . February 23, 1921.)

No. 76.

1. **Carriers** ☞108—**Duty to exercise care in handling explosives, in addition to compliance with legal regulations.**

Compliance by a carrier with the regulations of the Interstate Commerce Commission in the transportation of explosives does not relieve it from its common-law duty to exercise such additional care as is required by the circumstances of the particular case.

2. **Evidence** ☞208(2)—**Pleadings in other cases containing admissions held admissible.**

In an action against a railroad company for loss and damage to property in transit, alleged by plaintiff to have been due to defendant's negligence, and which resulted from a fire originating in cars containing explosives, standing in the same yard, causing explosions which destroyed and damaged plaintiff's property, where the cause of the fire was in controversy on the trial, the pleadings in other cases, in which defendant admitted that the fire was due to incendiarism, *held* admissible.

3. **Carriers** ☞108—**Liable to holder of bill of lading for loss due to negligence; "caused by it."**

Under the Carmack Amendment to the Interstate Commerce Act (Comp. St. § 8604a, 8604aa), providing that a carrier shall be liable to the holder of a bill of lading for any loss, damage or injury to the property "caused by it," such liability extends to loss or damage due to its failure to exercise its common-law duty of due care according to the circumstances.

4. **Trial** ☞314(1)—**Instruction to give weight to opinions of other jurors approved..**

Instruction to a jury, on report of inability to agree, that it was the duty of each juror, especially if in the minority, to keep an open mind and give careful thought to the views of other jurors, *held* proper and commendable.

In Error to the District Court of the United States for the Southern District of New York.

Action at law by the Allied Machinery Company of America against the Lehigh Valley Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Hornblower, Miller & Garrison, of New York City (Lindley M. Garrison and Edgar H. Boles, both of New York City, George S. Hobart, of Newark, N. J., and Charles A. Boston, of New York City, of counsel), for plaintiff in error.

Hartwell Cabell, of New York City (Edwin G. Marks, of New York City, of counsel), for defendant in error.

Butler, Wyckoff & Campbell, of New York City (Frederick B. Campbell and Thomas R. Rutter, both of New York City, of counsel), amici curiæ.

Before WARD, ROGERS, and HOUGH, Circuit Judges,

WARD, Circuit Judge. The Lehigh Valley Railroad Company operates a great railroad terminal on a peninsula extending easterly from the west or New Jersey side of the Upper Bay of New York, known

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 254 U. S. —, 41 Sup. Ct. 625, 65 L. Ed. —.

as the Black Tom Terminal. The distance from the easterly or water end to the land end is 4,900 feet, and at the easterly end there is a yard of 11 acres in extent and about 600 feet wide from the north to the south side, where loaded cars are stored.

On the night of July 29/30, 1916, there were 39 cars standing on the north side of the yard, 11 loaded with high explosives, 3 with wet nitro-cellulose, 17 with ammunition for cannon, 2 with combination fuses, 5 with benzol, and 1 with toluol.

On the south side of the yard there were standing 19 cars loaded with machinery under straight nonnegotiable bills of lading for export, lighterage free, of the New York, New Haven & Hartford Railroad Company, consigned to the plaintiff, the Allied Machinery Company, and one car consigned to the same company under a straight non-negotiable bill of lading of the Chicago & Northwestern Railway Company, goods to be delivered at Black Tom Terminal.

All of these cars, except the last, were in course of transportation in interstate commerce for export, and the liability of the defendant in respect to all of them was that of warehouseman, and not of common carrier, by virtue of a provision in the uniform bill of lading approved by the Interstate Commerce Commission providing that, in case goods are not removed within a certain time after notice of arrival, the liability of the railroad company shall become that of warehouseman.

During the night a small fire broke out in one of the ammunition cars on the north side of the yard, which gradually increased, and at 2:07 a. m. a great explosion occurred, followed by a second half an hour later, as the result of which all the goods in the 20 cars mentioned standing on the south side of the yard were damaged or destroyed. The Allied Machinery Company, as consignee of 19 cars and as assignee of the claim of the shipper of the twentieth car, instituted this suit to recover for the loss.

The plaintiff's right of recovery depends entirely on proving negligence on the part of the railroad company. The cause came on for trial before Judge Mack. The verdict was for the plaintiff for the full amount of its claim, and this writ of error was taken to the judgment entered thereon.

There are 46 assignments of error, but we shall take up only the contentions which underlie those which were argued. For instance, the plaintiff's right to maintain the action was not contested, nor was its right to recover for the loss in connection with the twentieth car, which amounted to less than the sum of $3,000.

[1] The defendant claims that, if it complied with the regulations of the Interstate Commerce Commission as to the transportation of explosives, it discharged its full duty. The trial judge rightly held that those regulations were exclusive whenever they applied, but that Congress had not attempted to regulate the whole subject, and that the defendant remained under the common-law duty of exercising care according to the circumstances, wherever Congress and the Interstate Commerce Commission had provided no regulations as well as where they had. It is evident that such regulations in the nature of things

are applicable to the handling of these dangerous agencies in all situations. But there remains the care appropriate to the particular situation in each case which it would be impossible to cover by general regulations. Such an instance is illustrated in Texas & Pacific R. R. Co. v. Coutourie, 135 Fed. 465, 68 C. C. A. 177, and Marande v. Texas & Pacific R. R. Co., 184 U. S. 173, 22 Sup. Ct. 340, 46 L. Ed. 487. The care required on a terminal like the defendant's, accessible not only from one end by land, but at the other and on both sides by water, might differ from that required in a terminal accessible only from the land. So the care required where cars loaded with dangerous explosives stand near other cars might be different from the case where they were widely separated. A multitude of such cases could be suggested. Can it be believed that conformity with these regulations will excuse a carrier from maintaining a proper watch to discover fires and proper equipment to extinguish them? If not, then the question of the sufficiency of what has been provided is a proper subject of inquiry.

The court treated the question of the origin of the fire from two points of view, viz. either as the result of spontaneous combustion, as the defendant claimed, or incendiarism, as the plaintiff claimed. He instructed them that, if the fire was the result of spontaneous combustion, all testimony of the defendant's practice in respect of permitting persons to come into the terminal from the land and water sides was totally irrelevant. If, however, it was of an incendiary origin, especially in view of the German propaganda and the general apprehension of acts of violence from German sympathizers, such evidence was quite material. Of course, in either case, the sufficiency of the fire equipment would be a relevant inquiry in connection with the question of the care exercised by the railroad company.

[2] Upon the question of the origin of the fire the court quite properly admitted, over the objection and exception of the defendant, the pleadings in two cases brought by other parties in the Supreme Court of the state of New York to recover for damages resulting from the same explosion. The complaint in each of these cases charged:

"XVIII. That the said fire and explosion hereinbefore specified in paragraph IX herein was caused by incendiarism."

To which the defendant's verified answer responded:

"Eighteenth. The defendant admits the allegations of paragraph XVIII of the complaint."

These admissions were properly received, although they were not conclusive. They were made some time after the present suit was brought, and there was no attempt to qualify or explain them. Pope v. Allis, 115 U. S. 363, 6 Sup. Ct. 69, 29 L. Ed. 393; Cook v. Barr, 44 N. Y. 156.

[3] Although the action was for negligence, and not upon the bill of lading, the goods were still in the course of transportation, and the right of the consignee as lawful holder of the bill of lading to maintain an action for negligence in respect to the property held by the carrier as warehouseman is governed by the Carmack Amendment of the Interstate Commerce Act, section 7, Act June 29, 1906, 34 Stat. 595 (Comp.

St. §§ 8604a, 8604aa), Penna. R. R. Co. v. Olivit Bros., 243 U. S. 574, 37 Sup. Ct. 468, 61 L. Ed. 908; Southern Ry. Co. v. Prescott, 240 U. S. 632, 36 Sup. Ct. 469, 60 L. Ed. 836; Georgia Ry. Co. v. Blish Milling Co., 241 U. S., 190, 36 Sup. Ct. 541, 60 L. Ed. 948. For the purpose of this case, the amendment, which is the same in all subsequent amendments of the Interstate Commerce Act, as it was when originally passed, reads:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: Provided, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.

"That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."

It is argued that only loss or damage can be recovered of a railroad company which is "caused by it." Very true. But such loss or damage may be caused either by the affirmative action of the carrier or by its passive failure to exercise its common-law duty of due care according to the circumstances. It is equally liable in either case. Adams Express Co. v. Croninger, 226 U. S. 491, 506, 33 Sup. Ct. 148, 57 L. Ed. 314, 44 L. R. A. (N. S.) 257; Kansas Southern Ry. Co. v. Karl, 227 U. S. 639, 649, 33 Sup. Ct. 391, 57 L. Ed. 683.

The case was plainly one for the jury, and the trial court submitted to their consideration in a full and fair charge the question whether the defendant exercised due care, having in view the size and character of the terminal and the storage in the yard of cars loaded with explosives and the general apprehension of incendiarism from German sympathizers, the sufficiency of the fire equipment, as to the number of hydrants, amount of hose, proper number of watchmen, and whether its employees had seasonably discovered the fire, and had exercised proper care to extinguish it, or to reduce the extent of its effect, or whether, if it had not failed in one or more of these duties, the loss might have been prevented. If so, the damage was "caused by" the railroad company within the meaning of the Carmack Amendment.

The argument that this explosion was to be treated like an act of God, such as the Johnstown flood, the San Francisco earthquake, or the volcanic eruptions at Mt. Pelee and Mt. Etna, does not convince us; but even in such cases of vis major the defendant would be obliged to show in addition that the loss was inevitable—that is, could not have been prevented by the exercise of due care on his part. This is exactly what the jury have found against the defendant in this case. Their verdict is binding upon us as to all questions of fact which there

was any evidence to support; our jurisdiction relating exclusively to questions of law.

[4] Finally, it is said that the trial judge erred in his remarks to the jury as to the influence of the views of the majority upon the views of the minority:

"At 12:20 the jury sent in the following note: 'The jury is hopelessly divided.' Whereupon the court instructed that the jury be brought in and the following took place:

"The Court: Gentlemen, I do not propose endeavoring to coerce you into coming to an agreement; but it is my duty to point out to you just what your duty is in that respect. Of course, in the end, every man must answer to his conscience—that is to say, as he thinks is right; but every juryman must make an honest endeavor to see the point of view of the other men, to keep his mind absolutely open, not to get into an obstinate state of mind, and to endeavor, as far as he honestly can, to give the most careful thought to what a majority of his fellows believe to be the solution.

"I do not mean to say that if, after doing that, a juror is absolutely convinced that the majority is wrong, that he has not the right to abide by his own judgment. But, just as in a case before several judges, so in a case before a jury. When one or more finds himself or themselves in a minority, or even if there is an equal division, it behooves every reasonable man to get into a condition of humility of mind as to his own powers of reasoning and judgment, and to consider and reconsider whether the majority, if there is a majority one way or the other, has not, on the whole, reached the sounder conclusion.

"Our law compels a retrial unless the jury is unanimous. That involves both the state, the country, and the parties in a very considerable expense and loss of time, and it is for that reason that I am always loath to let a jury go on their statement—even on their repeated statement—that they believe themselves hopelessly divided. I am glad to give any further instructions on any point as to which you are in doubt; to go as fully as you please into any phase of the case that you point out, that you believe more light is needed in the way of direction as to the law, because, as I have said, in the end you have got to decide the facts.

"This case is a large one; it is, of course, of great importance to the parties, and of great importance to the state; it was well tried, tried as rapidly, I think, as it could have been tried—more rapidly than ordinarily a case of that kind is tried—and yet a disagreement will mean going through that whole process over again. Now, if you are all convinced that you have gone at this thing from all possible angles and with a firm endeavor to see one another's point of view, and that, despite the great inconvenience to the public and the parties, further consideration is sure to be hopeless, there would be nothing further to do but to accept the inevitable. But if, after what I have just said, you think there is a chance, that you are not so hopelessly divided—I mean so evenly divided—but that you think there is a chance that a minority may be willing again to weigh the points of difference between you in the light of the views of the majority, particularly after anything further that I could say on which you would require further light, I should want you, after recess for lunch, to get together again this afternoon.

"I know that it is an inconvenience to you, too; but, of course, that is what you are here for. Every jury duty is an inconvenience. I should not keep you to-night, but I should want to keep you this afternoon, if there is any chance whatsoever of your getting together."

The jurors thereupon asked for further instructions in respect to the powers of the Interstate Commerce Commission in regulating the handling of explosives and as to the extent of the regulations it had actually promulgated. After receiving further instructions upon this

point in entire accord with the original charge, the jury retired at 12:45 p. m., and at 2:55 p. m. returned, rendering a verdict for the plaintiff. What the trial judge did is, in our opinion, eminently wise and fair.

The judgment is affirmed.

HOUGH, Circuit Judge (concurring). The issue of fact herein was raised by one sentence of the complaint as amended after trial began, viz.: That the subject-matter of suit "was destroyed while in the possession of the defendant * * * and became wholly lost to [plaintiff] through the negligence of the defendant." Under such pleading I do not think that the admission contained in defendant's answer in another litigation should have been received in evidence. That it was competent is thought to be true; the law in my judgment, being stated in Wig. Ev. § 1066. But the admission was neither relevant nor material to a charge of negligence so generally made; for non constat that incendiarism was either negligence or evidence thereof. Nor did anything else proven suggest incendiarism.

But, having regard to the whole course of trial, I think the error harmless, because the trial consisted merely in a general survey of all the conditions of life and business at the Black Tom Terminal. It seems to me, and, indeed, I think it admitted, that no one from this evidence can say with any certainty how, when, or why the fire started; the one thing certain is that there was a fire before the tremendous explosion occurred. Amid this mass of information, or misinformation, the fact that in another litigation another plaintiff had asserted incendiarism, and defendant had admitted it, became, I think, wholly unimportant and uninfluential—therefore in substance immaterial and irrelevant.

The very interesting and important question presented by this record and the treatment of it in the court below is well stated by plaintiffs in error in arguing that the duty of defendant was defined by law, and the function of the jury was to determine disputed matters of fact, and not to determine the measure of defendant's duty; whereas, the trial judge laid down as matter of law no measure of duty, further than that of exercising an "ordinary and reasonable care dependent on all the surrounding circumstances," and so left it to the jury to determine what precautions should have been taken by the railroad company having regard to the explosive character of much of the goods then on Black Tom, and thus the jury determined what measure of duty the defendant owed to plaintiff with respect to the goods in question.

The law on this subject must be derived from the statements thereof by courts of authority. Where the gravamen of action is negligence, I had until lately supposed that it was the duty of the court to lay down a definite measure of duty or standard of conduct demandable from both plaintiff and defendant, and leave to the jury only the question whether the facts showed a failure in that duty or deviation from the standard so defined by him. Such, however, is not the law as lately and repeatedly laid down by this court, and this case was in my judgment tried in strict accordance with the doctrine I tried to define in Lehigh, etc., Co. v. Scanlon, 259 Fed. 143, 170 C. C. A. 205.

Furthermore, in respect of this particular disaster, it was held in New Jersey, etc., Co. v. Lehigh, etc., Co., 92 N. J. Law, 470, 105 Atl. 207, that it was for the jury to say whether defendant exercised "that degree of care commensurate with the risk of danger arising from the accumulation" of explosives upon its premises. This is equivalent to saying that the court handed over to the jury the measurement of defendant's duty, when the only tool for measurement was the suggestion (long after the event) of what might have been done to obviate the possibility of a disaster of proportions previously unheard of; and this ruling by a large and able court was left undisturbed by the Supreme Court through denial of certiorari. 249 U. S. 600, 39 Sup. Ct. 258, 63 L. Ed. 796. By this great weight of very recent authority I am compelled to conclude that no material error was committed in the trial below, and to concur in the result of the majority opinion.